IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
333 CONSTITUTION AVENUE, N.W.
WASHINGTON, D.C. 20001

DUANE R. OLSON,

    Plaintiff,　　　　　　　　　　　　CASE NUMBER: <u>1:06CV00565</u>

Versus　　　　　　　　　　　　　　　<u>The Honorable James Robertson</u>

THE UNITED STATES OF AMERICA,
    Defendant.
_____/

## A MOTION FOR A STATUS REPORT

COMES NOW, DUANE R. OLSON the Plaintiff, to Respectfully Request a STATUS REPORT on the above styled Action and FEDERAL QUESTION now moving before this Honorable Court.

### As Cause:

The Plaintiff is well aware of the Awesome Responsibility he has placed before this Honorable Bench, and whether the Protection of Our Precious Documents for self-governing requires One to "take the beach at Normandy", patrol the streets of Bagdad, or render an Opinion Contrary to "the major voice of the Community" requires "an uncommon portion of fortitude", Courage, and Bravado. Still...

Nearly 6-months have passed since the Plaintiff initiated his "FEDERAL QUESTION" on March 24, 2006, and the Plaintiff would Respectfully Inquire of the Court, Is the "QUESTION" moving, or Is the "QUESTION" dormant?

**RECEIVED**

SEP 13 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Inquiring mind(s) and ghost(s) of 'any person' like;

- MINI MATOS...
- ANTHONY DIOTAIUTO...
- SALVATORE CULOSI...
- ALBERTA SPRUILL...
- EDWARD CORRIGAN, his mother/two young daughters...
- MARTIN and LEONA GOLDBERG, and...
- THE WILLIAMS FAMILY...

are but a few examples of the results of the Operation(s) of the "tuncated-version" of Title 21 U.S.C. § 841! (See WALL STREET JOURNAL Article hereto attached)

With dead-bodies on both sides, the Plaintiff would Respectfully Inquire of this Honorable Court...how much longer must "We the People" wait for the Judicial Branch "[t]o say what the law is"?

Respectfully Submitted,

Plaintiff — *[signature]*
Duane R. Olson (pro-se)
Reg. No: 04931-424
P.O. Box 779800  Unit "C"
Federal Correctional Institution
Miami, Florida  33177

THE WALL STREET JOURNAL.   OPINION   SATURDAY/SUNDAY, SEPTEMBER 2 - 3, 2006   A9

## Rule of Law / By Radley Balko and Joel Berger

# Wrong Door

The Supreme Court ruled this June that evidence seized in an illegally performed "no-knock" police raid can still be used against a defendant. Though disturbing in its own right, *Hudson v. Michigan* touched on only a small part of a larger problem—the trend toward paramilitary tactics in domestic policing.

Criminologist Peter Kraska estimates that the number of SWAT team "callouts" soared past 40,000 in 2001 (the latest year for which figures are available) from about 3,000 in 1981. The vast majority are employed for routine police work—such as serving drug warrants—not the types of situations for which SWAT teams were originally established. And because drug policing often involves tips from confidential informants—many of whom are drug dealers themselves, or convicts looking for leniency—it's rife with bad information. As a result, hundreds of innocent families and civilians have been wrongly subjected to violent, forced-entry raids.

Last year, for example, New York City police mistakenly handcuffed Mini Matos, a deaf, asthmatic Coney Island woman during a pre-dawn raid. While her young son and daughter burst into tears, Ms. Matos's plea to use her asthma pump was ignored until an officer realized they entered the wrong apartment.

Home invasions can also provoke deadly violence because forced-entry raids offer very little margin for error. Since SWAT teams began proliferating in the late 1980s, at least 40 innocent people have been killed in botched raids. There are dozens more cases where low-level, nonviolent offenders and police officers themselves have been killed.

Last summer a SWAT team in Sunrise, Fla., shot and killed 23-year-old Anthony Diotaiuto—a bartender and part-time student with no history of violence—during an early-morning raid on his home. Police found all of an ounce of marijuana. This January a member of the Fairfax, Va. SWAT team accidentally shot and killed Salvatore Culosi, a local optometrist with no criminal record, no history of violence and no weapons in his home. Police were investigating Culosi for wagering on sporting events with friends.

Public officials are rarely held accountable when mistakes happen. The Culosi family has yet to be given access to documents related to the investigation of his death, including why a SWAT team was sent to apprehend him in the first place. More than a year after Diotaiuto's death, his family too has been denied access to any of the documents it needs to move forward with a lawsuit.

New York City provides perhaps the most egregious example of public officials' reluctance to rein in the excessive use of paramilitary tactics. Throughout the 1990s, the city's newspapers reported a troubling, continuing pattern of "wrong door" drug raids. In many cases, tactical teams raided homes based solely on uncorroborated tips from unproven informants.

Members of the city's Civilian Complaint Review Board cautioned that they were seeing increasing complaints of botched raids, but limited jurisdiction and bureaucratic turf wars prevented them from doing anything about it. The principal result of the CCRB's warnings was the creation of a special police unit for the sole purpose of fixing locks, doors and windows in cases where forced-entry searches were performed on the wrong premises. Civil rights attorneys warned that without more substantial changes, it was only a matter of time before an innocent person would be killed in a botched drug raid.

They were right. In 2003, acting on a bad tip from an informant, police mistakenly raided the Harlem home of Alberta Spruill, a 57-year-old city worker. The violence of the incursion literally scared Spruill to death; she died of a heart attack at the scene. The raid spurred public outrage, calls for reform, and promises from the city to change its ways. The NYPD published new guidelines calling for more reliability when taking tips from informants. The city also promised greater vigilance in conducting surveillance and double-checking addresses before a SWAT team was sent in.

But later, during the course of a lawsuit stemming from another, mistaken raid—in 1992, on corrections officer Edward Corrigan, his elderly mother and two young daughters—the city declared that all of the post-Spruill reforms it had promised were merely *discretionary*, not enforceable in court, and could be revoked at will by any future mayor or police commissioner.

In any case, botched raids have *not* stopped. In 2004, police arrested a Brooklyn father of two in a drug raid and held him *for six months* at Riker's Island. In March of this year they dropped all the charges, conceding that he had been wrongly targeted. The man's lawyer called it the worst case of malicious prosecution she'd ever seen. Also in 2004, police mistakenly raided the home of Martin and Leona Goldberg, a Brooklyn couple in their 80s, when an informant provided bad information. "It was the most frightening experience of my life," Mrs. Goldberg later said. "I thought it was a terrorist attack."

The NYPD goofed again in 2005, when a SWAT team raided the Brooklyn apartment of the Williams family, instead of the targeted apartment on the same floor. Police continued to search the apartment even after it was obvious they were in the wrong home. This year, according to the CCRB, there have already been at least 15 mistaken raids.

A few cities, such as New Haven, Conn., and San Jose, Calif., restrict the use of SWAT teams to cases where a suspect presents an immediate threat. Denver dramatically cut back the number of "no-knock" raids conducted after a SWAT team shot and killed an innocent man in a botched raid in 1999, and follow-up investigations revealed severe deficiencies in the how police had obtained "no-knock" warrants.

But these examples are few and far between. Most of the country is moving toward more militarization, more aggressive drug policing—and less accountability when things go wrong.

---

*Mr. Balko is the author of "Overkill: The Rise of Paramilitary Police Raids in America," published by the Cato Institute, where he is a policy analyst. Mr. Berger is an attorney representing the Williams and Garrison families and a former New York City Law Department executive.*

# CERTIFICATE OF SERVICE

I, DUANE R. OLSON, hereby Swear and Certify, under penalty of perjury, pursuant to Title 28 U.S.C. § 1746, that a TRUE and CORRECT copy of the foregoing was mailed First Class to the following Interested Party(s):

| | |
|---|---|
| THE HONORABLE ALBERTO GONZALEZ<br>UNITED STATES ATTORNEY GENERAL<br>ROOM 5111<br>MAIN JUSTICE BUILDING<br>950 PENNSYLVANIA AVENUE, N.W.<br>WASHINGTON, D.C.  20530 | M/S RHONDA C. FIELDS<br>ASSISTANT U.S. ATTORNEY<br>555 FOURTH STREET, N.W.<br>CIVIL DIVISION<br>WASHINGTON, D.C.  20001 |
| MR. RADLEY BALKO<br>WALL STREET JOURNAL<br>DOW AND COMPANY<br>1025 CONNECTICUT AVENUE, N.W.<br>WASHINGTON, D.C.  20036 | MR. JOEL BURGER<br>WALL STREET JOURNAL<br>DOW AND COMPANY<br>1025 CONNECTICUT AVENUE, N.W.<br>WASHINGTON, D.C.  20036 |
| NEWS EDITOR<br>NEW YORK TIMES<br>229 WEST 43rd STREET<br>NEW YORK, NEW YORK  10036 | NEWS EDITOR<br>WASHINGTON POST<br>1150 15th STREET, N.W.<br>WASHINGTON, D.C.  20071 |

Plaintiff/Affiant

Duane R. Olson   (pro-se)
Reg. No: 04931-424
P.O. Box 779800  Unit "C"
Federal Correctional Institution
Miami, Florida  33177

Executed on this __11th__ day of __September__, 2006.